United States District Court
Southern District of Texas
**ENTERED**
July 05, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Extreme Technologies, LLC, | § | |
| and Hard Rock Solutions, LLC, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action H-19-1977 |
| | § | |
| Stabil Drill Specialties, LLC, | § | |
| *Defendant*. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court are Plaintiffs' motion for partial summary judgment on Defendant's patent invalidity affirmative defense based on assignor estoppel, ECF No. 163, and Defendants' cross-motion for partial summary judgment that assignor estoppel does not apply, ECF No. 169. The motions are before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). The undersigned recommends that Plaintiffs' motion be **GRANTED,** and that Defendant's motion be **DENIED**.

### 1. Background

Plaintiffs Extreme Technologies, LLC, and Hard Rock Solutions, LLC, "operate as wholly owned subsidiaries of Superior Drilling Products, Inc. [SDPI,]" and are engaged in the research and development of "drilling tools, including horizontal drill string enhancement tools." Pls.' Am. Compl. ¶ 7, ECF No. 149. Hard Rock Solutions, LLC, "develops and manufactures improved, dual-stage, eccentric reamer and bore conditioning systems," including a reamer named Drill-N-Ream. *Id.* ¶ 11. Defendant Stabil Drill Specialties, LLC, (Stabil Drill) offers the Smoothbore Eccentric Reamer (Smoothbore) for sale, rent, or

lease to third parties in direct competition with the Drill-N-Ream. Def.'s Ans. to Am. Compl. ¶¶ 19, 20, ECF No. 151.

### A. Patents in Suit and Assignments

The three patents at issue in this case (the Patents in Suit) are:

- Method and Apparatus for Reaming Well Bore Surfaces Nearer the Center of Drift, Patent No. US 8,813,877 B1 . . ., issued August 26, 2014, based on Application No. 13/517,870, filed June 14, 2012, which was a continuation of Application No. 13/441,230, filed on April 6, 2012, and claims the benefit of Provisional Application No. 61/473,587, filed on April 8, 2011;

- Method and Apparatus for Reaming Well Bore Surfaces Nearer the Center of Drift, Patent No. US 8,851,205 B1 . . ., issued October 7, 2014, based on Application No. 13/441,230, filed April 6, 2012, claiming the benefit of Provisional Application No. 61/473,587, filed April 8, 2011; and

- Method and Apparatus for Reaming Well Bore Surfaces Nearer the Center of Drift, Patent No. US 9,657,526 B2 . . ., issued May 23, 2017, based on Application No. 14/454,320, filed August 7, 2014, which was a continuation of Application No. 13/517,870, filed on June 14, 2012, and claims the benefit of Provisional Application No. 61/473,587, filed on April 8, 2011.

ECF Nos. 149-1–149-3. The Patents in Suit all list Lot William Short, Jr., Robert Bradley Beggs, and Richard Earl Beggs as the inventors (collectively, the Inventors). *See id.* The Patents in Suit "generally cover apparatuses for increasing the drift diameter and improving the well path of a well bore." Pls' Am. Compl. ¶ 11.

On April 8, 2011, Short and James Daniel Isenhour assigned their ownership in Provisional Application No. 61/473,587 to which the Patents in Suit claim priority, to 3cReamers, LLC, owned by Isenhour, who also owned Hard Rock

Solutions, Inc. Gilbert Troy Meier's Decl. ¶¶ 3–4, ECF No. 134-1; ECF No. 169 at 25. The assignment stated that that the sum of one dollar and "other good and valuable consideration" was received. ECF No. 134-2 at 3. Short and Isenhour agreed to provide upon request:

> all pertinent facts and documents relating to said invention, improvements and said Letters Patent and legal equivalents as may be known and accessible to [them and to] testify as to the same in any interference, litigation or proceeding related thereto and will promptly execute and deliver . . . all papers, instruments or affidavits required to apply for, obtain, maintain, issue and enforce said application, said invention, said improvements and said Letters Patent and said equivalents thereof which may be necessary or desirable to carry out the purposes thereof.

*Id.* Hard Rock Solutions, LLC, began manufacturing the Drill-N-Ream reamers in 2011. Meier's Decl. ¶ 5.

On February 20, 2013, Isenhour, Hard Rock Solutions, Inc., Short, Short Bit & Tool Company (Short Bit), and 3cReamers, LLC, entered a confidential settlement agreement resolving a legal dispute that arose between Isenhour and Short regarding their joint venture in manufacturing, designing, selling, and leasing down-hole tools to the oil and gas industry. ECF No. 163-7. On the same day, the Inventors assigned their ownership in Application Nos. 13/517,870, 13/441,230, and 13/442,316, two of which were later issued as the Patents in Suit, to 3cReamers, LLC. Meier's Decl. ¶ 6; *see also* ECF No. 134-3. The assignment specifically included "provisional, divisional, renewal, substitute, continuation, reexamination and reissue applications . . . claiming the benefit of the filing date of any of the Applications[.]" ECF No. 134-3 at 4, 7. The assignment also

3

acknowledged the receipt and sufficiency of "good and valuable consideration[.]" *Id.*

On April 3, 2014, 3cReamers, LLC, assigned its ownership in the '587 application, as well as all patent applications claiming priority therefrom, to Hard Rock Solutions, Inc. Meier's Decl. ¶ 7; *see also* ECF No. 134-4. On May 8, 2014, Hard Rock Solutions, Inc., assigned the same patent applications, which later became the Patents in Suit, to Hard Rock Solutions, LLC. Meier's Decl. ¶ 8; *see also* ECF Nos. 134-5–134-6.

On September 11, 2015, Hard Rock Solutions, LLC, assigned the Patents in Suit to Extreme Technologies, LLC, SDPI's intellectual property holding company. Meier's Decl. ¶ 9; *see also* ECF Nos. 134-7–134-9. At the same time, Hard Rock Solutions, LLC, became the exclusive licensee to practice the Patents in Suit. Meier's Decl. ¶ 10. On May 12, 2016, Hard Rock Solutions, LLC, executed an exclusive distribution agreement with Drilling Tools International, Inc., for the distribution of the Drill-N-Ream reamer products. *Id.* ¶ 11.

### B. Stabil Drill's Relationship with the Inventors

Short contacted Stabil Drill in January 2015 "regarding a potential new reamer design he had come up with in collaboration with [co-inventors] Robert B. Beggs and Richard E. Beggs" who "are principals of Short Bit[.]" ECF No. 163-1 at 5; ECF No. 17-3 ¶ 11. On January 20, 2015, Short linked the Drill-N-Ream's product brochure website in an email and represented, "The only thing that is actually patented is two tandem eccentric 'Reamers' oriented 180 degrees apart. If you replace the PDC cutters with carbide domes in either one then you don't violate the patent, but it works just the same (and maybe with less torque)." ECF No. 163-8 at 6.

4

At that time, Stabil Drill was looking for an alternative to traditional Bottom Hole Assembly products, which "were not well equipped for deviated wells, where the twists and turns in the wellbore created significant drift and resulted in high torque." ECF No. 163-1 at 4. In May 2017, Stabil Drill requested a meeting, and, in June 2017, Gabriel Teodorescu, Stabil Drill's Engineering and Technical Services Director, met with Short to discuss the new reamer design. ECF No. 163-11 at 5. In the extensive communications between Short and Stabil Drill, Short imparted knowledge and assistance about the new reamer design, including information about development, manufacturing, capabilities, potential infringement, novel features, cost, and repairs. *See, e.g.*, ECF No. 163-8 at 3; ECF No. 163-9 at 21–22, 24, 29–31, 33–34; ECF No.163-10 at 15–17; ECF No. 163-13; ECF No. 163-15–163-17; ECF No. 164 at 2; ECF No. 164-1–164-3; ECF No. 165-1; ECF No. 165-5; ECF No. 165-6 at 6, 8–9, 13, 16; ECF No. 169-5–169-8; ECF No. 169-16 at 2.

Short, Beggs, Beggs, Teodorescu, and a retired Stabil Drill employee, Donnie Williams, worked together in the development of the Smoothbore. ECF No. 17-3 ¶¶ 10, 11; *see also* ECF No. 163-3 at 2–3. By May 24, 2017, Short provided Stabil Drill with computer assisted design (CAD) drawings. Teodorescu's Dep. at 296–97, ECF No. 163-10; *see also* ECF No. 164 (clarifying that the model was "designed to be one of two eccentrics . . . [that] will be run 180 degrees out to mimic the SDPI patented reamer but will not violate their patent"). Neither Teodorescu nor Williams made changes to Short's drawing. Teodorescu's Dep. at 395. The design of what became Stabil Drill's Smoothbore "evolved from a 2-D sketch by . . . Short to a 3-D model by contractor Taylor Oilfield." ECF No. 163-1 at 5. A September 2017 email sent to employees of Stabil Drill, Taylor Oilfield, and

Short Bit noted Williams's belief that everything that Short had "fed" Stabil Drill was included in "the latest up to date drawing of the eccentric reamer." ECF No. 164-4. Short Bit installed the domes, cutters, and cutting tooth inserts and performed repairs on the Smoothbore. Teodorescu's Dep. at 314–15; ECF No. 17-3 ¶ 8; ECF No. 163-9 at 7, 13, 23–24; ECF No. 164-6 at 2–3; ECF No. 164-7.

The Smoothbore "is made by installing the cutting tooth inserts in the cutter section and the rounded dome inserts in the stabilizer section of a generic tubular body[.]" ECF No. 17-3 ¶ 8. Short Bit and Stabil Drill performed this work. *Id.* Stabil Drill has identified Short as someone with knowledge of the conception, reduction to practice, and inventorship of both Stabil Drill's Smoothbore and the Patents in Suit, as well as design and development information regarding the Smoothbore. ECF No. 163-3 at 3.

On January 24, 2018, the Inventors filed a provisional patent application for the Smoothbore adding Teodorescu and Williams as inventors. ECF No. 165-2. Short, Beggs, Beggs, and Short Bit assigned their rights, title, and interest in the invention to Stabil Drill in exchange for a one and two-thirds percent royalty on the gross revenues derived from the Smoothbore. ECF Nos. 165-4 at 9; 165-6 at 8. Short Bit was paid for hours and materials provided during the design and testing of the Smoothbore and has the right to one-sixth of the sale price if any of the patents are sold outside of Stabil Drill affiliates. ECF No. 165-6 at 8–9. According to Stabil Drill, Short assisted in manufacturing the first few prototypes, and Stabil Drill later took over production. *Id.* at 5. Stabil Drill performed a trial run in February 2018 and, a few months later, began renting the Smoothbore to third parties. *Id.*; *see also* ECF No. 163-9 at 28–34.

6

In April 2018, Teodorescu requested that Short send "the 3D model of the old style eccentric reamer . . . . The one that cannot be patented." ECF No. 164-8.

### C. Procedural Posture

Extreme Technologies, LLC, filed this lawsuit on February 21, 2019, in the Western District of Louisiana. ECF No. 1. The case was transferred to this district in May 2019. ECF No. 30. Extreme Technologies, LLC, amended its complaint to add its exclusive patent licensee Hard Rock Solutions, LLC. ECF No. 149. In its answer, Defendant raised the defense of invalidity as to all Patents in Suit. ECF No. 151 ¶¶ 37, 39, 41. Defendant generally asserted that each patent "is invalid under one or more of the provisions in Title 35 of the United States Code, including §§ 101, 102, 103, and 112, or under other judicially created bases for invalidity." *Id.*

In May 2022, Judge Hughes entered an order on claim construction on the terms "cutting blade" and "cutting teeth." ECF No. 128. In relevant part, the court found: "Longitudinal means straight up and down, while conversely, latitudinal is straight left and right. Anything in between is angled regardless of degree. The patent does not describe blades arranged straight up and down[.]" ECF No. 128 at 2. In November 2022, Plaintiffs filed a motion for partial summary judgment on Defendant's invalidity defense based on the doctrine of assignor estoppel. ECF No. 154. Before Defendant responded, Plaintiffs moved to withdraw the motion upon receiving relevant supplemental document production. *See id.* at 1–2. Plaintiffs refiled the motion for partial summary judgment on December 13, 2022, arguing that the doctrine of assignor estoppel bars Defendant from challenging invalidity. ECF No. 163. In connection with its response, Defendant filed a cross-motion arguing that Short and

7

Short Bit made no explicit or implicit representation of validity of the assigned patent applications and that Plaintiffs are extending the reach of the claims of the Patents in Suit beyond what Short understood or intended. ECF No. 169 at 7.

### 2. Summary Judgment Standard

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, "[t]he movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If this burden is met, the nonmovant must then "go beyond the pleadings," using competent summary judgment evidence to cite "specific facts" showing a genuine issue for trial. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The court, however, does not have a duty "to search the record for material fact issues." *RSR Corp.*

*v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) ("Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports [the] claim.").

"[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'" are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "[T]here must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Cross-motions "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004). If no genuine issue of material fact exists and one party is entitled to summary judgment as a matter of law, the court may grant that party's motion for summary judgment. *Id.*

### 3. Summary Judgment Analysis

The parties have filed cross-motions for partial summary judgment on the application of the doctrine of assignor estoppel. In their motion for partial summary judgment, Plaintiffs seek a ruling that the doctrine of assignor estoppel applies to prohibit Defendant from challenging the validity of the Patents in Suit. Defendant argues that the doctrine should not apply to Short and that, regardless of whether Short may be subject to assignor estoppel, Defendant is not. The court notes that the parties, by filing cross-motions on the same issue, agree that no genuine

9

dispute of material fact exists and that the court can determine whether the doctrine applies as a matter of law.

### A. The Doctrine of Assignor Estoppel

The doctrine of assignor estoppel is "rooted in an idea of fair dealing [and] limits an inventor's ability to assign a patent to another for value and later contend in litigation that the patent is invalid." *Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, 2302 (2021). It applies "when, but only when, the assignor's claim of invalidity contradicts explicit or implicit representations he made in assigning the patent." *Id.* Assignor estoppel is "mainly concerned with the balance of the equities between the parties." *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). The doctrine also prohibits one in privity with the assignor from challenging the validity of a patent when the assignee sues for infringement. *MAG Aerospace Indus. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1379–80 (Fed. Cir. 2016); *see also Shamrock Techs., Inc.*, 903 F.2d at 793 (stating that one in privity with the assignor partakes of the balance of equities between the parties).

A seller of patent rights "makes an (at least) implicit representation to the buyer that the patent at issue is valid[.]" *Minerva Surgical, Inc.*, 141 S. Ct at 2309; *see also id.* at 2310 ("[T]he original warranty need not be express; as we have explained, the assignment of specific patent claims carries with it an implied assurance."). If the assignor later raises an invalidity defense against the assigned patent, "the assignor disavows that implied warranty" and engages in unfair dealing. *Id.* at 2309; *see also id.* at 2310 ("When an assignor warrants that a patent is valid, his later denial of validity breaches norms of equitable dealing."). The principle of fair dealing "demands consistency in

representations about a patent's validity[.]" *Id.* at 2310. Contradiction in representations is what creates unfairness. *Id.*

As examples of when the inventor's representations would not be considered to unfairly contradict with a later challenge to the validity of the assigned patent, the U.S. Supreme Court discussed three scenarios. *Minerva Surgical, Inc.*, 141 S. Ct at 2310. First, the Court explained that an employee who assigns to his employer the rights in any future inventions that he develops but leaves to his employer the decision whether to patent any invention makes no representation of validity as to those inventions not yet in existence. *Id.* That is not the situation in this case. Second, the Court explained that a change in law after an assignment may render a previously valid patent invalid; in which case, "no principle of consistency prevents the assignor from saying so." *Id.* That also is not the situation in this case. Third, the Court explained that, in the case of an assigned patent *application*, a subsequently issued patent may include claims that are materially broader than those claimed in the application; in which case, the assignor is held to have made no representation about the expanded patent claims. *Id.* Only this scenario is argued here.

By filing a patent application, Short implicitly represented that the Inventors of the claimed invention believed they were entitled to the patent. *See Minerva Surgical, Inc.*, 141 S. Ct. at 2302 (noting that a typical patent application requires a representation that the applicant is entitled to the patent sought). Moreover, in assigning his ownership rights in the patent applications to which the Patents in Suit claim priority, Short confirmed that he had received "good and valuable consideration." ECF No. 134-2 at 3; ECF No. 134-3 at 4.

11

Defendant argues that the assignments were for "less than the alleged value of the applications" and thus carry no implicit representation of validity. ECF No. 169 at 27. The court disagrees. Short's representations in the assignments themselves forwent that argument. *See* ECF No. 134-2 at 3; ECF No. 134-3 at 4; *see also* ECF No. 163-7 at 3 (stating in the Isenhour and Short settlement agreement that Short accepted the settlement payment as "full satisfaction" for all agreements between the parties including the purchase of the '870 and '230 applications).

By selling his patent rights, Short also made at least an implicit representation that the patent was valid. *See Minerva Surgical Inc.*, 141 S. Ct. at 2309 (stating that selling one's patent rights is tantamount to representing that the patent "will actually give the buyer his sought-for monopoly").

Before imposing assignor estoppel on Defendant, though, the court must decide whether a challenge by Short to the Patents in Suit would amount to a contradiction in light of his representations of validity. Defendant argues that it would not because the claims of the Patents in Suit are materially broader than the claims as they existed in the underlying applications at the time of assignment. If the court finds that the claims now being asserted by Plaintiffs against Defendant are not materially broader than the claims as they existed at the time of the assignment, then the court must decide whether privity between Short and Defendant justifies estopping Defendant from denying the validity of the Patents in Suit.

### B. Materially Broader Claims

To determine whether the claims of the Patents in Suit are materially broader than at least one claim recited in the assigned application, the court must "construe the assigned and issued claims and compare the properly construed claims, focusing on

the material aspects of those claims." *Hologic, Inc. v. Minerva Surgical, Inc.*, 44 F.4th 1358, 1364–65 (Fed. Cir. 2022). If the broadest claim that existed at the time the application was assigned is broader than the claims in the Patents in Suit, then assignor estoppel may apply. *See id.* at 1360.

Defendant argues that, to the extent the Inventors made any implicit representation that the '877 and '205 patents are valid, assignor estoppel does not apply because the assignees later broadened the claims during patent prosecution beyond what Short "intended[] to claim as patentable." ECF No. 169 at 26 (quoting *Minerva Surgical, Inc.*, 141 S. Ct. at 2310); *see also* ECF No. 180 at 8. The issue is ultimately a question of law when it can be "decided only on the intrinsic evidence." *Hologic, Inc.*, 44 F.4th at 1365. Because the court can decide the issue based only on the '870 and the '230 applications and the '877 and '205 patents, the issue may be decided as a matter of law.

Following the Federal Circuit's approach in *Hologic*, Plaintiffs point to Claim 25 of the '870 application as the broadest claim that existed at the time the '870 and '230 applications were assigned. Defendant argues that the proper comparison is not between "the broadest claim pending in **any** application at the time of the assignment" but that the analysis must be conducted on a patent-by-patent basis. ECF No. 280 at 8 (emphasis in original). The court disagrees. The assignment of the '870 and '230 applications included "provisional, divisional, renewal, substitute, continuation, reexamination and reissue applications . . . claiming the benefit of the filing date of any of the Applications[.]" ECF No. 134-3 at 4, 7. Because the issued patents are continuations of earlier filed applications, the disclosures are identical. All the claims in all the applications

relied on the same specification. All the Patents in Suit claim priority to the '587 application filed on April 8, 2011. *See* Part 1., above. It thus does not matter which application any claim is attached to. The inventors warranted the validity of all the assigned claims, and their breadth cannot vary based on which application they were filed under because each had the same specification. *Cf. Hologic*, 44 F.4th at 1365 (finding that, because the assignment assigned rights not only to the application but also to "any continuation, continuation-in-part, or divisional applications not yet filed[,]" a claim canceled prior to the assignment still traveled with the assigned application and carried the warranty of validity).

Based on Plaintiffs' assertion that Claim 25 has the fewest limitations of any claim in the assigned applications,[1] the court compares Claim 25 to the claims in the Patents in Suit.

Claim 25 of the '870 application states:

25. A reamer assembly for increasing the diameter of a well bore, comprising:

a length of drill pipe having a longitudinal axis and an outer surface;

a first reamer secured for rotation with the length of drill pipe, the first reamer having a cutting area disposed outwardly beyond the outer surface of the length of drill pipe longitudinally aligned with the first reamer cutting area;

---

[1] The court assumes for purposes of resolving the instant motions that Claim 25 of the '870 application is the broadest claim that was assigned. To the extent there is a broader claim among those assigned, Plaintiffs' choice of Claim 25 cuts against Plaintiffs, not Defendant.

14

a second reamer coupled to the first reamer for rotation with the first reamer and the drill pipe, the second reamer having a cutting area disposed outwardly beyond the outer surface of the length of drill pipe longitudinally aligned with the second reamer cutting area; and

wherein the central area of the first reamer cutting area is angularly displaced about the longitudinal axis of the length of drill pipe from the central area of the second reamer cutting area.

ECF No. 169-17 at 8.

Claim 25 is thus recites a dual reamer having cutting blades aligned with the longitudinal axis of the reamer, with the two sets of blades being angularly displaced from each other about the longitudinal axis of the length of drill pipe. As previously construed by the Judge Hughes, which the undersigned does not at this juncture revisit, longitudinal means "straight up and down," and "[a]nything in between [longitudinal and latitudinal] is angled." ECF 128 at 2. An "acute angle" measures less than ninety degrees. As a result, Claim 25 was limited to having cutting blades aligned "straight up and down" along the axis of rotation of the drill pipe.

Citing the initial claims in the '870 and '230 applications, Defendant argues that Short intended to claim as patentable "a dual reamer with blades at an acute angle to the longitudinal axis of the reamer—blades aligned with the longitudinal axis." ECF No. 169 at 26. Defendant further argues that the '877 and '205 patents were broadened during prosecution and after they were assigned by removing the "acute angle limitation." *See* ECF No. 180 at 8.

The court agrees that the limitation to having the cutting blades longitudinally aligned with the reamer was removed during prosecution and that removal of that limitation broadened the claims. However, as will be discussed next, the issued claims contain many limitations not included in the broadest assigned claim. Thus, the issued claims were both broadened in one sense and narrowed in others. The question before the court is whether removal of the "longitudinally aligned," or "acute angle" limitation *materially* broadened the assigned claims. The court answers that question in the negative.

The specifications of the Patents in Suit describe a way of reducing the "drift diameter"[2] of a well bore. The specification describes many configurations of cutting surfaces, including those that are not "longitudinally aligned" with the center of rotation of the reamer. *See, e.g.*, ECF No. 149-2 at15–16, Figs 13, 14. But the specification does not describe any advantages or disadvantages related to the angle between the cutting surfaces and the longitudinal axis of the reamer itself. Rather, the specification describes and shows many other aspects of the cutting surfaces. For example, it describes the cutting surfaces being on opposite sides of the reamer. That is, the cutting surfaces are angularly displaced *about*, not *along*, the longitudinal axis of the reamer. *See, e.g., id.* at 6, Figs. 1a, 1b; *id*. at 18, col. 3, lines 10-17.  The specification also describes reamers having cutting surfaces only on one side of the reamer. *See, e.g., id.* at 6–7, Figs 1b, 2, 3; *id.* at 10, Fig. 6. The specification further describes multiple cutting surfaces displaced angularly about the longitudinal axis of the reamer, with each cutting surface extending progressively further

---

[2] As the court understands it, the drift diameter is the effective diameter of the well bore, which ends up being narrower than the actual diameter of the well bore because the drilling tools drift off center. ECF No. 149-2 at 17, col. 1, lines 53–63.

out from the reamer than the last. *See, e.g.*, *id.* at 19, col. 5, line 32–col. 6, line 16. These aspects of the invention, which result in removing material on only one side of the well bore, are credited with enlarging the drift diameter without having to enlarge the bore diameter. This can reduce drilling time and required torque. *Id.* at 18, col. 3, lines 47–59; *id.* col. 4, lines 5–9, 46–49, 55–63. In describing Figures 10, 13, and 14, all of which show cutting blades arranged at an angle to the longitudinal axis of the reamer, the specification says nothing about any benefit or advantage of so arranging the cutting surfaces. *Id.* at 19, col. 5, lines 14–31, 57–67; *id.* col. 6, lines 1–16.

Although "materially" is not defined in case law, it must mean those limitations that matter to the claimed invention. The longitudinal alignment of the cutting area with respect to the longitudinal axis of the reamer has nothing to do with the invention described and claimed. Rather, the invention pertains to having cutting surfaces on only part of the circumference of the reamer, having the cutting surfaces of the first and second reamers being diametrically opposed to one another, and having a plurality of cutting surfaces extend progressively further from the center of the reamer than the one before it. These things were inserted into the claims during prosecution and all narrowed the invention in a material way after the invention was assigned.

Even if the ultimately patented invention was broader than that which was set forth in Claim 25, in the sense that it did not include the "longitudinally aligned" limitation, it was not *materially* broader because longitudinal alignment was not truly relevant to the invention. Removing that limitation did not *materially* broaden the claims. The court thus finds that the patent claims are not materially broader than the broadest claim in existence at the time the applications were assigned. Assignor

17

estoppel applies to prevent Short from challenging the validity of the Patents in Suit. The court next addresses whether Short's relationship with Defendant extends assignor estoppel to prevent Defendant from denying the validity of the Patents in Suit.

### C. Privity

"Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities." *MAG Aerospace Indus.*, 816 F.3d at 1380 (quoting *Shamrock Techs., Inc.*, 903 F.2d at 793). Whether the doctrine extends beyond the assignor to an alleged infringer "depend[s] on the equities dictated by the relationship between the inventor and [the alleged infringer] in light of the act of infringement." *Shamrock Techs., Inc.*, 903 F.2d at 793. "The closer that relationship, the more the equities will favor applying the doctrine to [the alleged infringer]." *Id.* In other words, what matters in deciding whether the assignor and the alleged infringer were in privity for purposes of assignor estoppel is how close their relationship was as it relates to the alleged infringement. Thus, the critical time to determine privity is when the assignor and alleged infringer were working on the development of the allegedly infringing product. *See Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991) (finding that the "critical time" was when the inventor and alleged infringers entered a development agreement).

The Federal Circuit in *Shamrock Technologies, Inc.*, listed multiple sets of facts based on which courts over the years had found relationships close enough that the equities favored extending assignor estoppel to the alleged infringer. 903 F.2d at 793–94 (citing cases). Among those cases were findings of privity in the following situations: (1) "between assignor and co-developer of infringing device with company they formed to advance their interests in infringing device[;]" (2) "between

assignor and company of which he was principal stockholder, president, and general manager[;]" and (3) "between assignor and others who availed themselves of assignor's knowledge and assistance to conduct infringement[.]" *Id.* (citing *U.S. Appliance Corp. v. Beauty Shop Supply Co.*, 121 F.2d 149, 151 (9th Cir.), *cert. denied* 314 U.S. 680 (1941); *Stubnitz–Greene Spring Corp. v. Fort Pitt Bedding Co.*, 110 F.2d 192, 195 (6th Cir. 1940); *Mellor v. Carroll*, 141 F. 992, 993–94 (C.C.D. Mass. 1905)). In *Shamrock Technologies, Inc.*, the court addressed whether a company was bound by assignor estoppel in an infringement suit over a patent its employee had invented but had assigned to his former employer. 903 F.2d at 790. The undisputed facts showed that: (1) the inventor joined the new company as vice president in charge of operations; (2) he owned 50,000 shares of stock in the company; (3) the company expanded its operations into the subject area of the invention covered by the patent that had been assigned; (4) the inventor oversaw the design and construction of the necessary facilities; (5) the inventor was hired in part to begin the infringing operations; (6) the inventor played a role in the decision to engaged in those operations; (7) those operations began after the inventor had joined the company; and (8) the inventor was in charge of those operations. 903 F.2d at 794. The parties here focus on these facts as if they are factors to be considered in every case. ECF No. 163 at 21–22; ECF No. 169 at 36–37. The Federal Circuit was not setting out a test to be used in every case to determine whether privity exists but simply laid out the undisputed facts before it. The court found that the inventor "was far more than a mere employee . . . and the undisputed facts establish[ed] [the company's] direct involvement of [the inventor] in [its] infringing operations." *Shamrock Techs., Inc.*, 903 F.2d at 794. The court found significant that the

19

company "clearly availed itself of [the inventor's] 'knowledge and assistance' to conduct infringement." *Id.* (quoting *Mellor*, 141 F. at 994); *see also Intel Corp.*, 946 F.2d at 839 (quoting *Shamrock Techs., Inc.*, 903 F.2d at 793); *Dane Indus. v. Ameritek Indus.*, 154 F. App'x 894, 899 (Fed. Cir. 2005) (citing *Intel Corp.*, 946 F.2d at 839).

Here, the evidence shows that the interactions between Short and Stabil Drill were numerous and that their relationship was very close. Notably, the relationship was based entirely on developing the allegedly infringing reamer and doing so in a way that would avoid infringing the Patents in Suit.

As discussed above, Short approached Stabil Drill with the reamer design that ultimately became the Smoothbore. Short informed Stabil Drill that he had developed it in collaboration with Beggs and Beggs, explained his opinion that the design differed from Plaintiffs' Drill-N-Ream reamer, and reassured Stabil Drill that, although the design was intended to mimic the Drill-N-Ream, it would not violate the underlying patent. Although Stabil Drill did not employ Short, Stabil Drill's employees worked in collaboration with Short to develop the reamer, including in-person meetings with representatives of Stabil Drill, email communications about the design and the reamer's capabilities, development cost, and repairs. Short provided CAD drawings, which Stabil Drill left unchanged. Stabil Drill incorporated everything in the ultimate product that Short had included in the design.

Short and his company Short Bit assisted in manufacturing prototypes, installed essential parts, and performed repairs on the Smoothbore. Although Stabil Drill did not employ Short, it paid Short Bit for the work it performed and paid a royalty on revenues generated by the Smoothbore. When the Inventors filed

a provisional patent, they included two Stabil Drill employees as co-inventors. Thereafter, the Inventors assigned their rights in the claimed invention to Stabil Drill and received a royalty on the gross revenues from the Smoothbore and a right to a percentage of the sale price in the event the patents were sold to an unaffiliated entity.

Defendant does not present evidence that contradicts any of these facts. Rather, Defendant contends that the nature of the relationship does not justify estopping Defendant from raising an invalidity defense. The court disagrees. The court acknowledges that Short was neither an employee nor an investor. However, Short provided the technology to Stabil Drill and was continuously involved in developing and patenting the allegedly infringing product. Short was aware of the potential for infringing Plaintiffs' patent, shared that information with Stabil Drill, and openly made efforts to design around it. Importantly, Stabil Drill used Short's knowledge to develop the Smoothbore, now alleged to infringe. The evidence shows that, although others were a part of the process, Stabil Drill followed Short's design and guidance completely with little input from Stabil Drill. Under the circumstances here, the relationship between Short and Stabil Drill was close enough as it relates to the development of the Smoothbore that the equities favor extending assignor estoppel to Defendant.

The relevant facts are not in dispute, and Plaintiffs are entitled to judgment as a matter of law that the doctrine of assignor estoppel applies to prevent Defendant from challenging the validity of the Patents in Suit.

### 3. Conclusion

The court recommends that Plaintiffs' motion for partial summary judgment on Defendant's patent invalidity affirmative

defense be **GRANTED** and Defendants' cross-motion for partial summary judgment that assignor estoppel does not apply be **DENIED**.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on July 5, 2023.

_____

Peter Bray
United States Magistrate Judge